[No. 3873.]
WORTMAN v. THE PEOPLE.

RAPE—INSTRUCTIONS.

In a prosecution for rape where the only evidence introduced for the prosecution was the testimony of the prosecuting witness in which she claimed the offense was committed by physical violence, and there was no evidence of threats on the part of defendant, nor of facts from which the jury might legitimately infer that the prosecuting witness was induced to submit through fear of personal violence, the court instructed the jury as follows: "1. Where threats of personal violence are made to overcome the will of a woman, and she believes that her person is in danger from such threats, and is induced thereby to submit to the will of the person making such threats, and he has sexual connection with her, then the law

considers such carnal knowledge as having been forcibly and against the will of the female. 2. The court instructs the jury that where a female submits to sexual intercourse through fear of personal violence and to avoid the infliction of great personal injury upon herself, then such carnal intercourse is punishable as rape." *Held* reversible error, though such instruction would be correct where the facts called for its application.

*Error to the District Court of Lake County.*

Mr. N. ROLLINS and Messrs. WELLS, TAYLOR & TAYLOR, for plaintiff in error.

Mr. BYRON L. CARR, attorney general, Mr. CALVIN E. REED and Mr. GEORGE H. THORNE, for defendant in error.

CHIEF JUSTICE CAMPBELL delivered the opinion of the court.

The defendant was tried, convicted and sentenced for the crime of rape. To the judgment he sues out this writ of error and assigns numerous errors of the district court. In our view the consideration of but one of them is necessary, for our conclusion upon it results in a reversal of the judgment. A summary of the testimony will conduce to a better understanding of the legal questions involved.

The defendant was the manager of a mining company at Alacante, Lake county, Colorado, several miles distant from Leadville. Preliminary to starting up work on the mine, in the latter part of the year 1896, he came to Denver for the purpose of engaging a cook for the boarding house where the employees took their meals. He went to an employment agency and made known his wishes, and while there the prosecuting witness came in, her errand being to secure employment. She was then thirty-six years of age, had been married, but was divorced from her husband. She overheard the application of the defendant, and when he left the room stated to the agent what her object was, and by the latter was advised to drop a note to defendant making known her

wishes. This she did, and in response thereto the defendant called at her rooms, and a day or two thereafter made a second call, at which time, in the presence of her brother-in-law, he employed her as a cook.

Additional help was wanted by the defendant, and he told the prosecuting witness if a certain other woman whom the employment agent recommended was satisfactory, to arrange to bring her to the mine. Because the person designated was not satisfactory, or for some other reason, the prosecuting witness did not choose to have her as a companion, and so the defendant and the prosecuting witness together went to Alacante, where they arrived on the morning of the 30th of December.

The prosecuting witness testifies that from something that occurred on the journey she became suspicious of defendant, and claims that she supposed her destination was to be Leadville, whereas Alacante was several miles away. She also testifies that when they arrived at the mine she suspected a trap had been laid by Mr. Wortman to get her there, and she so told him, and asked to be sent back immediately. This he refused to do. At the mine was an employee, Mackey, who was a guard at the shaft house where he slept. On the property were also a boarding house and a lodging house, which is called in the testimony the bunk house. From December 30, to January 5, the only occupants of the bunk house were the defendant and the prosecuting witness, Mr. Mackey coming to the boarding house at meal times, when he did the cooking; but during the rest of the day, and at night, the sole occupants were the defendant and the prosecuting witness. In the winter nights they were accustomed to sit in the sitting room and read by the light of a candle. On the night of the 5th of January they were thus engaged when the candle went out, and then she says that defendant snatched her in his arms, and, as she was looking for trouble, she fought him all she could. The room was dark, and furniture was piled in it, and while carrying her in his arms defendant in soothing tones kept saying to her, "I won't hurt you. I

won't hurt you." Still repeating this language he then took her to the outside door, a distance of about ten feet, and then up a stairway, half dragging and half carrying her to her sleeping apartment. In the mean time she says that she was screaming or rather crying, and struggling with him as well as she could but was unable to resist him. When her room was reached he threw her on the bed, and there accomplished his purpose, and then departed. A short time thereafter (probably half an hour) he returned, and a second time accomplished his unlawful act. She says that she told him if he would marry her and let her go home, she would not have anything further to do with him, but this he refused to do.

The substance of the testimony of the prosecuting witness, in addition to the foregoing, is that from January 5, to the 4th of February, when she left, these acts of rape were continued from time to time whenever the defendant got a chance. She testifies, also, that during the month that she remained there she would sometimes undress herself in her own room and go to the room occupied by defendant and pass the night with him, and that sometimes she would first go to the room and then undress and occupy the same bed with the defendant, all of which acts she did from fear of his resentment.

It appears from the testimony produced by the prosecution that there was a lock to her door, with the key on the inside, and that when the defendant on the night of the 5th of January left the room she locked it, and when he returned she unlocked the door and admitted him. The bunk house was about ten or fifteen steps from the railroad track where daily a passenger and freight train each way passed the house, and at this place there was a section house where a number of section men and two women were stopping during all this time, and no outcry was raised, and no complaint at any time made, by the prosecuting witness to any person in that vicinity; but she testified that, within a few days after the first rape, she wrote to her sister about what had occurred, and asked for assistance, which did not come.

It will be observed from her testimony that the prosecuting

witness says that the defendant accomplished his purpose by means of physical violence, though not specifying its character; but she does not say that her will was overcome by, or that she submitted on account of, threats of violence or fear of any serious harm. On the contrary, she says that the language and conduct of the defendant, excepting the physical force which he exerted in carrying her to the room, were reassuring, and evidently for the purpose of disabusing her mind of any fear of violence.

The defendant admits the acts of sexual intercourse which he had with the prosecuting witness, but denies that he exerted any force whatever; on the contrary alleges that each and every of the acts were with the free and voluntary consent, previously given, and with the approval, of the prosecuting witness herself.

There are many circumstances and much direct testimony in support of defendant's claim; and in many important respects, not necessary to mention, the credibility of the prosecuting witness's testimony and her veracity are, to our minds, seriously shaken. We have thus set forth, in a general way, these disgusting details, for we consider it necessary in order more fully to bring out the errors in the instructions given by the court.

In the third instruction given, of its own motion, in stating the case to the jury, the court used this language:

" The defendant insists that she (the prosecuting witness) did voluntarily consent thereto (the acts in questions) and that he used no force or coercion of any kind to compel such consent, but that she yielded to his desires upon his request alone; while the prosecution insists that she did not voluntarily consent, but that she resisted to the full extent of her ability, and only yielded when her will was overpowered, and that if she finally submitted it was against her will and for fear of more serious consequences."

This fairly states the claim of the defendant both at the trial and upon this review. What contentions were made below by the prosecution can be ascertained by us only from

the record as certified up.   In that we fail to discover any suggestion by the district attorney, or by the prosecuting witness in her testimony, that she ever yielded to the defendant's advances, or that she involuntarily submitted as the result of her will being overpowered, or from fear of more serious consequences to herself.   On the contrary, her explicit testimony was that the rape was committed by physical force exerted by the defendant at the time.   There is not a line in the testimony that any threats of violence were made by the defendant, or that she apprehended any serious physical consequences to herself if she refused his advances.

The series of instructions asked by the district attorney would seem to indicate the sole theory upon which he was proceeding, viz: that the defendant forcibly and against the will of the prosecuting witness had carnal knowledge of her person.   Not a suggestion is contained in any of them that there was a claim upon her part that she yielded her will to the defendant on account of his threats or from fear of violence at his hands.   This notion that any such element was present in the case seems to have originated with the presiding judge himself; and so, after incorrectly stating the contention of the prosecution, he gave two other instructions, numbered one and two, as follows:

"1. Where threats of personal violence are made to overcome the will of a woman, and she believes that her person is in danger from such threats, and is induced thereby to submit to the will of the person making such threats, and he has sexual connection with her, then the law considers such carnal knowledge as having been forcibly and against the will of the female.

"2. The court instructs the jury that where a female submits to sexual intercourse through fear of personal violence and to avoid the infliction of great personal injury upon herself, then such carnal intercourse is punishable as a rape."

This is good law in a case whose facts call for its application; but why these instructions were given in this case we are at a loss to imagine; for while it is true that the defend-

ant says the prosecuting witness yielded to his request, such is not her testimony, and we have scanned it, as well as the entire record, in vain to find a word that any threat of violence was made, or that she feared her person was in danger, or that she was induced to submit to the defendant.

One object in summarizing the evidence was to show its weakness as tending to prove any employment of force; and it is possible that the trial judge, recognizing its insufficiency in this particular to secure, or warrant, a conviction, conjectured that there was enough evidence of threats, or facts from which that inference might be drawn, on which to hang the instructions above quoted.

The plaintiff in error complains of these instructions, not that they incorrectly state the law when there are facts justifying them, but there is an entire absence of evidence upon which they could be predicated; that therefore the jury were necessarily misled into believing that the prosecuting witness may have been overcome by threats of violence, and, if so, that it was not necessary to prove that any force was used.

The attorney general concedes the point that instructions not justified by the evidence are erroneous, but contends that, in this case these erroneous instructions may be regarded as mere surplusage, and that it must affirmatively appear that they were prejudicial before a reversal is justified. To this point are cited *Clare v. The People*, 9 Colo. 122; *Mackey v. The People*, 2 Colo. 13. He further contends that if there is any evidence in the case from which a jury may infer a certain state of facts, the court may declare to them the legal conclusion from such facts, without exceeding its province. The cases of *Flournoy v. Andrews*, 5 Mo. 513, *Bradford v. Pearson*, 12 Mo. 71, and *Camp v. Phillips*, 42 Ga. 289, are authorities upon this proposition, and unquestionably state the correct rule. If not the same, it is certainly similar in principle to the rule that in a criminal case the venue laid may be inferred or deduced by the jury from the proof of certain other facts. But in all these cases this inference which the jury may draw must be based upon certain other

established facts from which such an inference may legitimately be drawn.   Our attention is not directed by the attorney general to, and from a diligent examination of the record we are unable to find, such "other facts" which even remotely suggest or warrant an inference that the defendant ever made any threat, or offered any violence, by reason of which the prosecuting witness was induced to yield or submit to him, or that she ever involuntarily consented to his demand for fear of personal violence being inflicted upon her.

In the unbroken line of decisions in this class of cases there is grave doubt whether the evidence in several important particulars is legally sufficient to sustain the verdict.   Rape is the crime charged, and the defendant was not on trial for fornication, adultery, or for any offense against public morality inferior to rape.   We are entirely clear that prejudicial error of the gravest sort was committed by the court in the giving of the instructions complained of, for they were not based upon any facts in evidence, or upon any legitimate inference from other facts in evidence; and were necessarily misleading, for we feel satisfied that it must have been as the result of these instructions that the jury returned a verdict of guilty.

It follows that the judgment is reversed and the cause remanded.

*Reversed.*